IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

SAMANTHA CONNER                                                              PLAINTIFF

v.                                                    CIVIL ACTION NO. 1:22-CV-188-SA-RP

NOXUBEE COUNTY BOARD
OF SUPERVISORS                                                              DEFENDANT

MEMORANDUM OPINION

Plaintiff Samantha Conner brings this *pro se* action for unlawful employment discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq*.

The Court conducted a bench trial in this matter on February 20 and 21, 2024. Conner was present and represented herself. Defendant Noxubee County Board of Supervisors ("the Board") was present through Eddie Coleman, former President of the Board, and represented by Robert J. Dambrino, III.

Conner called the following witnesses in her case in chief: Sammy Conner, Cassandra McNeese, Alshaunta Lyles, and Samantha Conner. The Board called the following witnesses in its case in chief: Joyce Wooten, Henrietta Key, Doris Patterson, Eddie Coleman, and Christopher Hemphill.

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the following constitutes the Court's findings of fact and conclusions of law.

*Findings of Fact*

1.  Conner was employed by the Board as an assistant comptroller from June 28, 2020 until her termination on May 28, 2021.

2. At approximately age 18 or 19, Conner was diagnosed with dissociative identity disorder ("DID"), which is the disorder with which she primarily struggles. Conner was additionally diagnosed with post-traumatic stress disorder ("PTSD"), repetitive thought disorder, and clinical depression prior to the start of her employment with the Board.

3. Conner testified that her diagnosed conditions are related to sexual abuse she experienced as a child.

4. Conner testified that DID causes her to internally experience multiple personalities, which she refers to as "alters" or voices. The number of alters she experiences increases with stress. Stress may cause her to black out or experience a dissociative state.

5. Conner described a number of other symptoms attributable to her diagnoses, including crying spells, trouble eating and sleeping, and short-term memory issues.

6. Conner has regularly attended mental health therapy for 25 years.

7. Cassandra McNeese, Certified Mental Health Therapist, treated Conner at Mississippi Behavioral Health Services, LLC. At trial, Conner introduced medical records from Mississippi Behavioral Health Services, LLC dated June 8, 2020 and May 31, 2021. *See* [68], Ex. 3.

8. Conner receives Social Security disability benefits due to her diagnosed conditions. While employed by the Board, the Social Security Administration found that Conner continued to be fully disabled.

9. During her employment, Conner's direct supervisor was Comptroller Alshaunta Lyles.

10. Lyles and Conner are close friends, having met in 1999. Lyles was aware of Conner's diagnosed conditions.

2

11. Before Conner began working for the Board, she had not worked outside of her home for several years. She had avoided working outside of the home in order to reduce her contact with others, which exacerbated her stress and the symptoms of her conditions.

12. Prior to her start date, Conner asked Lyles for her own office so that she could have less contact with other people.

13. Lyles brought Conner's request to the Board but did not explain Conner's reason for the request.

14. Conner was not given her own office. Conner worked in a group of adjoined offices in the Noxubee County Courthouse. She shared an office with Ernestine McCleod, though their shared office was partially divided by a wall.

15. Conner's co-workers Joyce Wooten and Henrietta Key worked in the shared office space adjacent to Conner and McCleod's office.

16. Before she began working for the Board, Conner was evicted and subsequently experienced homelessness.

17. Conner thereafter filed a lawsuit challenging Mississippi's eviction laws. The lawsuit began to receive publicity in approximately December 2020 while Conner was employed by the Board.

18. From July 2020 until December 2020, Doris Patterson served as an Interim Supervisor on the Board.

19. In August 2020, Patterson met with the Board's employees individually, including Conner.

20. When Patterson met with Conner, Conner expressed that she should be paid more and that she should be paid for performing the job of the solid waste clerk who had been out with COVID-19. Conner also discussed her history of sexual abuse, mental disabilities, and recent homelessness with Patterson.

3

21. Patterson did not disclose her conversation with Conner to other Board members because she felt the conversation was very personal.

22. Several days later, Patterson brought Conner a card and gifted her $300.

23. While employed by the Board, Conner lived in Lowndes County, Mississippi, which is a county adjacent to Noxubee County.

24. Shortly after the Board voted to hire Conner, several Noxubee County residents attended a Board meeting where they expressed their dissatisfaction with the Board's decision to hire a Lowndes County resident, rather than a Noxubee County resident.

25. On October 19, 2020, Conner sent an email to Supervisors Bernard Brooks and Bryan Schimmel with the subject line "discrimination." In the email, Conner expressed that she was being treated differently because she was from Lowndes County.

26. On October 20, 2020, Conner appeared before the Board during the executive session portion of its meeting. Conner brought several complaints at that meeting. First, Conner complained that unlike other employees, she did not receive a raise at the end of her 90-day probationary period. Second, Conner complained that Wooten and Key were being paid for the work they performed for the Chancery Clerk, while she was not. Third, Conner complained that she was being treated differently because she was a Lowndes County resident. Fourth, Conner complained that she was being bullied and subjected to a hostile work environment.

27. At a Board meeting on December 11, 2020, Conner appeared before the Board to suggest COVID-19 mitigation measures. The Board unanimously approved her suggestions. *See* [68], Ex. 2.

28. In February 2021, Conner broadcasted a real-time video via Facebook Live. She streamed the Facebook Live video from a room at the Noxubee County Courthouse while on her lunch break.

29. In the Facebook Live video, Conner discussed an individual who had been convicted of a sex crime and recently released from prison.

30. Following the Facebook Live video, an individual called the courthouse seeking information about Conner. Wooten answered the phone when the individual called.

31. After the phone call, there was friction between Conner and Wooten. Conner accused Wooten of providing the caller with information about her.

32. Both Wooten and McCleod requested to be on the agenda of the Board's next executive session.

33. On February 22, 2021, Wooten appeared before the Board during the executive session and expressed concern about the Facebook Live video.

34. Wooten had not personally seen the Facebook Live video when she brought her concerns to the Board.

35. From the hallway, Conner overheard some of the statements Wooten made to the Board. Specifically, Conner overheard Wooten tell the Board that Conner was "certifiable" and that she did not want a "mental" person mad at her.

36. At the February 22, 2021 meeting, Conner also heard Supervisor Landis Mickens ask Wooten, "How can she be on disability and still work?"

37. When Wooten discussed the Facebook Live video with the Board, a small part of the discussion involved the "mental issues" Wooten alleged Conner exhibited. Specifically, Wooten told the

Board that Conner acted erratically and that Conner lashed out at her co-workers sometimes but ignored them at other times.

38. Board Attorney Christopher Hemphill then cautioned Wooten and the Board that the terms Wooten used to describe Conner ("certifiable" or "mental issues") were not terms that should be "thrown around."

39. When Wooten discussed the Facebook Live video with the Board, she alleged that an investigator in Lowndes County was the individual who called the courthouse seeking information about Conner. Hemphill then stepped out of the meeting and contacted the investigator for more information.

40. While employed with the Board, Conner sprayed her office with Lysol, an aerosol disinfectant, every morning.

41. Shortly before the February 22, 2021 meeting, Conner noticed that when she sprayed Lysol, McCleod, with whom she shared an office, would step outside of the office for approximately five seconds.

42. At the February 22, 2021 meeting, during executive session, McCleod complained to the Board that Conner was excessively spraying Lysol. Like Wooten, McCleod additionally expressed that Conner appeared very angry and at times would not respond to her co-workers.

43. After Wooten and McCleod exited the February 22, 2021 meeting, Hemphill advised the Board that even though Conner was an at-will employee, she could not be fired for a discriminatory reason. Hemphill and the Board additionally discussed whether they could discipline Conner for the Facebook Live video, given that there were no policies in place regarding employee use of social media.

44. At the February 22, 2021 meeting, the Board called Conner into executive session and told her to stop spraying Lysol.

45. The Board did not discuss the Facebook Live video with Conner because the Board had no social media policy in place at that time.

46. The day after the February 22, 2021 meeting, Supervisor Brooks met with Conner, Wooten, and Key. At this meeting, Brooks attempted to resolve the friction among the employees and encourage them to get along.

47. Conner did not appear before the Board again until May 21, 2021.

48. In May 2021, McCleod again asked to appear at the Board's next executive session to bring a complaint.

49. On May 21, 2021, McCleod appeared at the Board's executive session and complained that Conner's spraying of Lysol had worsened and was negatively affecting McCleod's health.

50. On May 21, 2021, after McCleod left the meeting, the Board called Conner into the meeting and instructed her to stop spraying Lysol. The Board informed Conner that the excessive spraying was causing a co-worker to have respiratory issues, though the Board did not disclose that it was McCleod that complained.

51. When the Board instructed Conner to stop spraying Lysol, Conner responded that she was concerned about her own health. The Board informed her that the sheriff's office had been spraying disinfectant every morning. Conner said "okay" and left the meeting.

52. Following the May 21, 2021 meeting, Conner called Lyles and asked if any other employee had been instructed not to spray Lysol. Lyles responded that other employees were not instructed to stop spraying and that she would call Hemphill to inquire about the situation.

53. After speaking with Lyles, Conner entered Key and Wooten's office and implied that they were involved in McCleod's complaint to the Board regarding Lysol. She told them not to use her as a scapegoat and lie about her to the Board when they wanted to get something done. She told them that the Board had called her (and only her) into the meeting and instructed her to stop spraying Lysol.

54. At some point during the exchange, Conner raised her voice and began yelling.

55. Conner stated that she would continue to spray Lysol and that the Board could not tell her what to do. Wooten in turn responded that she would continue to spray as well.

56. Key described Conner as "going off" at them. [68], Ex. 9 at p. 1. Key told Conner that she and Wooten had nothing to do with the Board calling her in to discuss the Lysol issue.

57. At some point during the exchange, Conner referred to the Board as "dumbasses" and said "fuck the Board." [68], Ex. 8 at p. 1. Conner also expressed that she was not afraid of the Board and that she was tired of the Board. *See* [68], Ex. 8 at p. 1; Ex. 9 at p. 1.

58. As the exchange occurred, Hemphill was heading toward the shared offices to give Wooten the minutes from the Board meeting that had just adjourned. As he was approaching the office, he heard Conner's raised voice. When he entered the office, he witnessed Conner accosting Key and Wooten.

59. After the exchange occurred, Conner called Lyles and asked to go home early, which Lyles approved. Conner expressed that she did not "feel right," that her alters were "kicking up," and that she did not want to go into a dissociative state while driving.

60. Conner was finishing a sentence as Hemphill opened the door and he did not hear what she said. However, Hemphill heard Key telling Conner that she "got the wrong people" and that she did not make the complaint.

61. When Hemphill exited the office, he saw Supervisor Schimmel simultaneously exiting an adjoining office. Schimmel told Hemphill, "Oh, she is upset."

62. Hemphill returned to the boardroom where the Board meeting had just adjourned. He told Coleman, then-President of the Board, that he had just witnessed Conner verbally attacking Wooten and Key. Hemphill suggested that Coleman talk to Wooten and Key to see what was said.

63. Coleman and Hemphill called Wooten and Key into the boardroom separately. They each stated that Conner said "fuck the Board" and referred to the Board as "dumbasses" who could not tell her what to do.

64. Hemphill told Coleman that if Wooten and Key's allegations were true, Conner's actions constituted insubordination and the Board would need to decide whether to take action. He informed Coleman that he should collect statements from Wooten and Key.

65. Coleman asked Wooten and Key to prepare statements describing what happened. Both Wooten and Key submitted statements dated May 22, 2021 to Hemphill via email. *See* [68], Ex. 8 and 9.

66. The May 21, 2021 incident occurred on a Friday. After discussing the issue with Hemphill on the phone over the weekend, Coleman determined that he would place Conner on administrative leave with pay pending an investigation of the incident.

67. When Conner arrived at the courthouse for work on Monday, May 24, 2021, Coleman (accompanied by a sheriff's deputy) met Conner at her car when she pulled into the parking lot. Through the car window, Coleman handed Conner a handwritten note that stated: "You are placed on administrative leave with pay pending investigation by the Board. This is for your actions and words after the board meeting on May 21 [and] for your conversation with

Joyce and Henrietta about disrespecting and disregarding the Board order about spraying Lysol." [68], Ex. 1 at p. 1.

68. Coleman did not inform Lyles, Conner's supervisor, that Conner was being placed on administrative leave.

69. Coleman did not ask Conner for a statement or otherwise interview Conner as part of the Board's investigation into the May 21, 2021 incident.

70. The Board called a special meeting to determine whether and how to respond to the May 21, 2021 incident.

71. At the special meeting held on May 28, 2021, Wooten confirmed her written statement under oath and Hemphill notarized it.

72. At the May 28, 2021 meeting, the Board voted to terminate Conner, effective that date.

73. In a Notice of Termination letter dated June 1, 2021, the Board informed Conner that she was being terminated "for cause" due to the May 21, 2021 incident. *See* [68], Ex. 5 at p. 21.

74. In September 2021, Conner filed an EEOC Charge alleging unlawful employment discrimination in violation of the ADA.

75. On December 6, 2022, Conner filed her *pro se* Complaint [1] alleging unlawful employment discrimination in violation of the ADA.

*Conclusions of Law*

"The ADA prohibits an employer from 'discriminat[ing] against a qualified individual on the basis of disability' by, among other things, terminating the individual's employment." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 479 (5th Cir. 2016) (quoting 42 U.S.C. § 12112(a)). In a discriminatory-termination action, "the employee may either present direct evidence that [she] was discriminated against because of [her] disability or alternatively proceed

10

under the burden-shifting analysis first articulated in *McDonnell Douglas*." *Clark v. Champion Nat. Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (citing *E.E.O.C. v. LHC. Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)).

## I.     Direct Evidence of Disability Discrimination

The Fifth Circuit has defined direct evidence as "evidence which, if believed, proves the fact without inference or presumption." *Id.* (citing *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)). "A statement or document which shows 'on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action [is] direct evidence of discrimination.'" *Id.* (citing *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018)).

At trial, Conner presented no direct evidence of discrimination. In her opening statement, Conner asserted that she would present direct evidence of discrimination. Then, during questioning and during her own testimony, Conner alleged that the Board had "direct knowledge" of her disability. However, she offered no *evidence* that on its face demonstrated that her disability played a role in the Board's decision to terminate her.

## II.     Circumstantial Evidence of Disability Discrimination

Where a plaintiff offers only circumstantial evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *Delaval*, 824 F.3d at 479 (citing *LHC Grp., Inc.*, 773 F.3d at 694). This framework first requires the plaintiff to establish a prima facie case of discrimination. *Id.* If the plaintiff establishes a prima facie case, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* (citing *LHC Grp., Inc.*, 773 F.3d at 694). If the employer provides such a reason, the burden finally shifts back to the plaintiff to prove that "either the reason is pretextual or, if that reason is

legitimate, that the employee's disability was a substantial motivating factor in the decision." *Diggs v. Burlington No. & Santa Fe Ry. Co.*, 742 F. App'x 1, 3 (5th Cir. 2018) (citing *LHC Grp., Inc.*, 773 F.3d at 702).

The Court will walk through each step of the analysis in turn.

### A.  *Prima Facie Case*

"To establish a prima facie case of discrimination under the ADA, a plaintiff must prove: (1) that [she] has a disability; (2) that [she] was qualified for the job; and (3) that [she] was subject to an adverse employment decision on account of [her] disability." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 470 (5th Cir. 2021) (citing *LHC Grp., Inc.*, 773 F.3d at 697).

As to the first prima facie element, the ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). The statute further indicates that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Conner's testimony and medical records indicate that she has trouble sleeping, eating, focusing, and controlling her angry outbursts. *See* [68], Ex. 3. Conner also testified that she has received Social Security benefits and that she was determined to be disabled while working for the Board. Further, the Board offered no evidence to dispute that Conner is disabled and conceded to the issue at trial. While making a Rule 50(c) Motion at trial, counsel for the Board stated that "there is no doubt [Conner] has a disability." Therefore, the Court finds that Conner is disabled under the ADA.

12

As to the second prima facie element, "[a] plaintiff can establish that [she] is qualified by showing that either (1) [she] could perform the essential functions of the job in spite of [her] disability, or (2) that a reasonable accommodation of [her] disability would have enabled [her] to perform the essential functions of the job." *Thompson*, 2 F.4th at 467 (citing *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017)). "Reasonable accommodations include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications or examinations, training materials or policies . . . and other similar accommodations.'" *Id*. (citing 42 U.S.C. § 12111(9)(B)).

In arguing that the Board had no knowledge of Conner's disability, counsel for the Board stated: "[S]he had a social security established disability that nobody in Noxubee County knew about. She didn't tell them. . . They didn't know about that. In fact, why would they because if she is fully disabled as she contends, how can she work? If she is fully disabled." It is true that where a plaintiff has also claimed Social Security disability benefits, a plaintiff must address the apparent inconsistency between a claim that she is "qualified" for employment under the ADA and "disabled" for Social Security purposes. *E.E.O.C. v. Vicksburg Healthcare, L.L.C.*, 663 F. App'x 331, 333 (5th Cir. 2016) (citing *McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 463 (5th Cir. 2005)). "A plaintiff's explanation of the apparent inconsistency must be 'sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation.'" *Id*. (citing *McClaren*, 420 F.3d at 463); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802-03, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999) (claims to disability benefits and the protections of the ADA "can comfortably exist

13

side by side" because, for example, the definition of disabled for purposes of disability benefits "does not take the possibility of 'reasonable accommodation' into account").

At trial, though the Board suggested that Conner's representations to the Social Security Administration may be inconsistent with her position that she "qualified" under the ADA, the Board offered no evidence to support that position. The Board offered no documents and solicited no testimony regarding the details of Conner's Social Security claim.

While the parties presented no evidence regarding the specific essential functions of Conner's job, the testimony overall suggested that Conner was qualified for her job. Conner worked for 11 months with only one accommodation. That is, Lyles allowed Conner to come in 10 minutes late at times because Conner's disorders caused difficulty sleeping. Conner did request an office to herself, but she was not given one and she worked for 11 months anyway. Therefore, the Court finds that Conner was qualified for her job.

The third prima facie element requires Conner to prove "that [she] was subject to an adverse employment decision on account of [her] disability." *Thompson*, 2 F.4th at 470 (citing *LHC Grp.*, 773 F.3d at 697). The parties do not dispute that Conner's termination was an adverse employment action. However, the Board's position at trial was that it had no knowledge of Conner's disability and therefore did not terminate her on account of her disability. In other words, the primary dispute in this case is whether Conner established a causal connection.

The evidence establishes that Wooten referred to Conner as "certifiable" and indicated that Conner was mentally ill when she complained to the Board about the Facebook Live video on February 22, 2021. Conner was terminated three months later. Because the prima facie burden is not onerous and the temporal proximity between the February 22, 2021 meeting and Conner's termination is somewhat close, the Court finds that Conner has established a prima facie case of

discrimination. *See Gosby v. Apache Indus. Servs., Inc.*, 30 F.4th 523, 527 (5th Cir. 2022) (close temporal proximity between termination and event that highlighted employee's ADA-protected disability sufficiently established causation at the prima facie stage). The Court will fully address the issues of knowledge and causation in the final step of the analysis.

### B. Legitimate, Nondiscriminatory Reason

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts back to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Delaval*, 824 F.3d at 479 (citing *LHC Grp., Inc.*, 773 F.3d at 694). At trial, the Board introduced a Notice of Termination letter that provided the following reasons for terminating Conner:

> Your termination is based on misconduct in the form of discourtesy, improper conduct and abusive language toward other employees specifically and, in general, toward the Board. In particular on May 21, 2021, after you were directed by the Board to cease the spraying of aerosol sprays in your office area due to it causing a health issue to another employee, you immediately left the Board meeting and proceeded to verbally attack two other employees due to their alleged involvement in making a complaint against you. You repeatedly used profanity and made disrespectful statements toward the Board including referring to them as "dumbasses" and "f—k the Board" in the presence of other employees. You stated that you would continue to spray the aerosol and that the Board could not tell you what to do. Some of your verbal attack was overheard by two county supervisors and the board attorney.

[68], Ex. 5 at p. 21.

Therefore, the Board articulated a legitimate, nondiscriminatory reason for Conner's termination.

### C. Pretext or Motivating Factor

If the employer articulates a legitimate, nondiscriminatory reason for its adverse employment action, the burden shifts back to the plaintiff to demonstrate "either (1) that the

defendant's reason is not true, but is instead a pretext for discrimination. . . or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic[.]" *LHC Grp., Inc.*, 773 F.3d at 702 (quoting *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

Before considering whether Conner's disability played a role in the Board's decision to terminate her, the Court must determine whether the Board had knowledge of Conner's disabilities. *See Taylor v. Principal Fin. Grp., Inc.,* 93 F.3d 155, 163 (5th Cir.1996) ("To prove discrimination, an employee must show that the employer knew of such employee's [disability].").

At trial, Conner testified that she told the Board at the October 20, 2020 meeting that she knew her rights as a disabled person and "protected class individual." She also complained that she did not receive a raise, complained that there existed a hostile work environment, and told the Board that she felt discriminated against as a Lowndes County resident.

Lyles, Patterson, Coleman, and Hemphill were present at the October 20, 2020 meeting. Lyles' testimony corroborated Conner's testimony that she referred to herself as a disabled person in a protected class. While Patterson and Hemphill deny that Conner referred to herself as a disabled person, their testimony corroborates the other complaints she made. They both remembered that Conner complained about a raise, and Patterson remembered Conner complaining of a hostile work environment.

Next, Conner, Hemphill, and Wooten testified that Wooten referred to Conner as "certifiable" at the February 22, 2021 Board meeting. Conner testified that while listening from the hallway, she heard Wooten call her "certifiable" and say that she did not want a "mental" person mad at her. Conner also heard Supervisor Mickens ask, "How can she be on disability and still work?"

Conner testified that prior to the February 22, 2021 meeting, she disclosed her mental disabilities to Wooten, Key and McCleod. She alleged that she told them about her history of sexual abuse and that she had mental disorders related to the abuse. She testified that she told Wooten, Key, and McCleod about her disabilities to control the narrative about her and prevent misinformation, as she believed that they had already heard that she was "mental."

For her part, Wooten confirmed that Conner told her about her history of sexual abuse.[1] She remembered that Conner was particularly upset around the anniversary of some of the abuse. However, she alleged that she had no knowledge of Conner's mental disabilities. When asked why she characterized Conner as "certifiable" if she had no knowledge of Conner's disorders, Wooten's answers were vague. She twice stated that her characterization was based on "the code of conduct." She also gave the following reasons: "because of the incidents that we were having and [Conner] would make you feel kind of like afraid of her and her behavior;" "[Conner] would act out;" and "[Conner's] behavior towards several little things." Wooten additionally alleged that Conner accused her of things she had nothing to do with. However, throughout her testimony, the only specific incident Wooten discussed was the incident with the Facebook Live video. Wooten alleged that this incident made her afraid after someone called the courthouse about it.

While Wooten alleged she had no knowledge of Conner's disorders, the vague reasons Wooten provided for calling Conner "certifiable" do not match the level of fear she expressed to the Board at the February 22, 2021 meeting. Wooten testified that she told the Board not to provoke Conner. She testified that "I didn't want to provoke [Conner] to do anything to make me think that [Conner] might take my life." It seems unlikely that Wooten would believe that Conner could be

---

[1] Key's statement on the May 21, 2021 incident additionally confirms that Conner disclosed her history of sexual abuse to Key and Wooten. It states: "We were in two different offices and some months before she came in and said some crazy stuff to us about being sexually abused." [68], Ex. 9 at p. 1.

easily provoked to commit violence if she had no knowledge of Conner's mental disorders. The Court finds that Wooten knew of Conner's mental disorders before she spoke with the Board on February 22, 2021 for the following reasons: (1) Conner's testimony that she disclosed her disorders and history of sexual abuse to Wooten, which Wooten corroborated in part; (2) Wooten feared Conner in a way that suggested Wooten was aware of Conner's disorders; and (3) at some point after Wooten referred to Conner as "certifiable," Mickens asked how Conner could be on disability and still work.

More importantly, the Court finds that Wooten's discussion with the Board at the February 22, 2021 meeting gave the Board knowledge of Conner's disabilities. Again, at that meeting, Mickens asked, "How can she be on disability and still work?" Moreover, Hemphill testified that when Wooten complained about the Facebook Live video, they briefly discussed Conner's "mental issues." Hemphill testified that after Wooten referred to Conner as "mental" or "certifiable," he advised against using those terms and asked Wooten to clarify what she meant. Hemphill additionally testified that he advised the Board that Conner could not be terminated for a discriminatory reason. He alleged that this was in the context of a discussion on the Facebook Live video and "whether that was a freedom of speech issue" given that there was no social media policy in place. Considering the totality of the circumstances, the Court finds that the Board had knowledge of Conner's mental disabilities.

This brings the Court to whether the Board's proffered reason for terminating Conner was pretextual *or* whether Conner's disability was a motivating factor in her termination. *See LHC Grp., Inc.*, 773 F.3d at 702. As noted, the Board's proffered reason for terminating Conner was the May 21, 2021 incident where Conner verbally accosted Wooten and Key, used profanities towards

them and in reference to the Board, and stated that she would continue to spray Lysol against the Board's order.

"Pretext is established either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Delaval*, 824 F.4th at 480 (citing *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)) (internal quotation marks omitted).

At trial, Conner attempted to demonstrate that the Board's proffered reason was false or unworthy of credence. She testified that she did not raise her voice or use profanity during her conversation with Wooten and Key on May 21, 2021. She alleged that she spoke so softly that Wooten and Key had to lean in to hear her and that Wooten was the one who called the Board members "dumbasses." However, she confirmed that she said she would continue to spray Lysol and that the Board could not tell her what to do.

The Court finds that Conner verbally accosted Wooten and Key and used profanity. Wooten and Key's statements, prepared the day after the incident, describe Conner as "screaming," "going off," and "using explicit profanity." [68], Ex. 8 at p. 1; [68], Ex. 9 at p. 1. At trial, Wooten and Key testified, consistent with their earlier statements, that Conner raised her voice and used profanities. Hemphill corroborated their statements and testimony, describing the incident as a verbal attack and testifying that he heard Conner's raised voice from the hallway. While Conner seemed to contend that the conversation was calm, she testified that she asked to go home immediately after the incident occurred because she feared she would go into a dissociative state. Wooten, Key, and Hemphill's largely consistent, corroborative, and credible testimony clearly demonstrates that Conner was upset about the Board's order and verbally accosted Wooten and Key while using profanities.

19

The other aspect of the Board's proffered reason is Conner's insubordination. That is, the Board terminated Conner in part because she stated that she would not follow its order to stop spraying Lysol. Conner admits that she said she would continue to spray Lysol. Thus, Conner failed to demonstrate that either aspect of the Board's proffered reason was false or unworthy of credence.

Additionally, at trial, Conner attempted to demonstrate pretext through evidence of disparate treatment. Specifically, she and Lyles testified that Wooten frequently used profanity while speaking to Board members, though Wooten, who is not disabled, was not disciplined. In the context of discrimination claims, "an employee who proffers a fellow employee as a comparator [must] demonstrate that the employment actions at issue were taken under nearly identical circumstances." *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 484 (5th Cir. 2023) (citing *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)). Conner did not produce evidence that Wooten used profanity while verbally accosting another employee or speaking about the Board. In other words, Conner and Wooten were not treated differently under "nearly identical circumstances." *Id.*

Further, Conner emphasized that Wooten said that she would continue to spray Lysol, suggesting that Wooten also disregarded the Board's order. However, the Board specifically instructed Conner to stop spraying because her excessive spraying was causing her office mate to have respiratory issues. There is no evidence that Wooten was instructed to stop spraying Lysol or that the Board had knowledge that she was spraying Lysol. Thus, again, Conner and Wooten were not similarly situated. Therefore, Conner produced no evidence of disparate treatment.

In summary, Conner did not provide evidence of pretext at trial. Conner can only prevail if she produced evidence demonstrating that her disability was a motivating factor in her

termination. *See LHC Grp., Inc.*, 773 F.3d at 702. The motivating factor test provides that "discrimination need not be the sole reason for the adverse employment decision . . . [so long as it] actually play[s] a role in the employer's decision making process and ha[s] a determinative influence on the outcome." *Delaval*, 824 F.3d at 479-80 (citing *LHC Grp., Inc.*, 773 F.3d at 702).

Conner had no interaction with the Board between the February 22, 2021 meeting and the May 21, 2021 meeting. At the February 22, 2021 meeting, Wooten discussed Conner's mental disabilities with the Board. McCleod also complained to the Board about Conner's Lysol use and indicated that she too was afraid of Conner. The following day, Supervisor Brooks called a meeting to encourage the employees to get along.

Three months later, on May 21, 2021, McCleod complained to the Board (for the second time) about Conner spraying Lysol. No evidence was presented at trial to indicate that Conner's disabilities were discussed at this meeting.

When Conner was called in to the May 21, 2021 meeting, she was instructed to stop spraying Lysol. Conner returned to her office, verbally accosted Wooten and Key, and indicated that she would continue to spray Lysol. The evidence demonstrates that after the Board instructed Conner to stop spraying Lysol, the verbal attack was the *only* reason she was brought to the Board's attention again. There is no evidence that the Board would have taken any further action against Conner had she returned to her office and complied with the Board's directive. Her disabilities had not been discussed in three months. And after her disabilities were discussed, a Board member attempted to diffuse the tension between Conner and her co-workers. Put simply, there is no evidence that connects the discussion of Conner's disabilities in February 2021 to the events of May 2021. Therefore, the Court finds that Conner's disabilities were not a motivating factor in the Board's decision to terminate her.

*Conclusion*

For the reasons set forth above, the Court enters judgment in favor of Defendant Noxubee County Board of Supervisors. Conner's Amended Complaint [6] is DISMISSED *with prejudice*.[2] A Final Judgment consistent with the Memorandum Opinion will issue this day. This CASE is CLOSED.

SO ORDERED, this the 17th day of April, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE

---

[2] On March 4, 2024, after the completion of trial, the Court received two additional filings from Conner. The first is a Response [69] to the Board's Motion in Limine [34], which the Court ruled on prior to trial. *See* [63]. The second is a Motion for Reimbursement [70] wherein Conner seeks to recoup costs of travel to the final pretrial conference that was rescheduled due to weather. In light of the Court's judgment, Conner is not entitled to costs. *See* Rule 54(d)(1) (costs are generally awarded to prevailing party). The Court therefore denies Conner's Motion [70] as moot.